IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| RUSSELL KISER | § | |
| v. | § | CIVIL ACTION NO. 6:08cv272 |
| MARK DEARING, ET AL. | § | |

MEMORANDUM OPINION AND PARTIAL ORDER OF DISMISSAL

The Plaintiff Russell Kiser, an inmate confined in the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se,* filed this lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in the lawsuit pursuant to 28 U.S.C. §636(c). As Defendants, Kiser named TDCJ officers Mark Dearing, William Sexton, Johnathan Hyatt, Heath Strange, Robert Nash, Cody Barber, William Jock, Regina Oliver, and Mikkal Robbins.

An evidentiary hearing was conducted on April 16, 2009, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985). At this hearing and in his complaint, Kiser said that on June 29, 2006, he was assaulted by Dearing, Sexton, Nash, Hyatt, Strange, and Barber. Kiser said that he was returning from the pill window when Strange called him over and asked "why he was disrespecting his [Strange's] officers." Kiser denied doing so. Sgt. Dearing ordered a strip search and Kiser complied.

During the pat-down portion of the search, Kiser said, he was asked again why he disrespected the officers. Strange asked for his inmate ID card, and Kiser turned his head, but was told not to do so. Strange said that Kiser had disrespected the sergeant two days earlier.

1

At this point, Kiser says, he had removed all of his clothes. Strange handed him back his boxer shorts and told him to take off his glasses and run his fingers through his hair. When Kiser removed his glasses, Hyatt grabbed them. Strange then took off his own glasses and swung at Kiser. Kiser states that he ducked this punch, but hit another officer's forearm. He was then hit in the back of the head with a handcuff. Kiser says that he went down to the ground and the officers hit and kicked him. Strange asked if he was going to disrespect the officers again, and Kiser said that he never did.

Kiser said that Sgt. Dearing came over and kicked him after he was already secured on the ground. He said that he believed that Dearing was the "ringleader."

Kiser said that he received a disciplinary case over the incident. He stated that he thought that the use of force videotape would show that Dearing accused him of assaulting an officer, but that the nurse said that this was not possible, and so the charge was changed to lunging at an officer.

With regard to the other defendants, Kiser said that Sexton had hit him with the handcuffs, Strange punched him in the face, head, and shoulders, and Nash and Barber punched and kicked him in the sides, legs, and groin. He stated that he could not say for sure that Hyatt had hit him, but that Hyatt held his glasses and Strange's glasses while the use of force took place, and so he believed that Hyatt was "a party to the conspiracy." He identifies Mikkal Robbins as the camera operator, and says that she saw Dearing kick him in the head, but did not start the camera until after the assault was over.

Kiser stated that Jock was the disciplinary captain who found him guilty in the disciplinary proceeding. He said that Jock conspired with Regina Oliver, his counsel substitute, and that the hearing was broken up into three separate parts.

In the first portion of the hearing, on July 5, 2006, Strange was called on the phone and said that it took five officers to restrain Kiser; however, the phone got disconnected and they could not get Strange back. Nine days later, the hearing resumed; at this time, Strange said that he was the only officer present and that he hit Kiser with his ring. Kiser says that the hearing record shows that

2

the officers did not testify, but they did, and their testimony was "taken out of the record." Specifically, Kiser says, his testimony and that of Officer Sexton was removed from the record. On July 19th, Kiser says, he was given a sentence of 15 days in solitary confinement; however, he says that because of the way the hearing was broken up, he was actually in solitary for 40 days, indicating that he was in pre-hearing detention from the time of the incident until he received punishment.

Nurse Kathy Grey, R.N., a correctional nurse also present at the evidentiary hearing, gave sworn testimony concerning the contents of Kiser's medical records. Nurse Grey said that on June 29, 2006, Kiser was brought to the infirmary and found to have a laceration in the back of his head as well as redness on his chest, back, shoulder, and nose. Five staples were used to close the laceration.

Warden Baker, a TDCJ official also present at the hearing, testified that some of the officers involved in this incident were no longer employed by TDCJ, although he did not know whether or not they had been terminated from employment as a result of this incident. He noted that it was not unusual for cameras to arrive at the scene of a use of force after the incident had already ended.

The video opens with Dearing on the ground, with the incident over. He is escorted to the infirmary, where the nurse checks his blood pressure and temperature. She listens to his heart and abdominal sounds and then checks the laceration on the back of his head. She asks him how it happened and he tells her that he was hit with handcuffs. The nurse cleans what appears to be blood off of his neck and shoulders, and another person comes over and shaves around the wound. Kiser is photographed and an ice pack is placed on his head. After several minutes, a bandage is wrapped around Kiser's head and he is escorted to 11 Building. The sound quality of the video is not good and so it is not clear whether or not the nurse said that it was not possible for Kiser to have lunged at the officers.

The medical records show that later that day, Kiser was seen by Dr. Robert Roe, who cleansed the wound with Betadine, closed it with five "metallic skin clips," and noted that Kiser's tetanus shots were up to date.

Legal Standards and Analysis

The Supreme Court, in Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995 (1992), held that inmates raising allegations of excessive force must show that the force used was malicious and sadistic for the very purpose of causing harm rather than in a good faith effort to restore discipline; the Court also noted that the Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "repugnant to the conscience of mankind." Hudson, 112 S.Ct. at 999. Kiser's claims against Dearing, Strange, Barber, Nash, Sexton, and Hyatt, if proven, set out potential constitutional violations, and so his claims against these officers require further judicial proceedings. Although Kiser did not know if Hyatt had actually struck him or not, his testimony, which the Court takes as true for purposes of the evidentiary hearing, made clear that Hyatt was part of the incident and that the officer did nothing to try to prevent it. *See, e.g.*, Harris v. Chanclor, 537 F.2d 203, 205 (1976).

Kiser also sues the disciplinary hearing officer, Captain Jock, and his counsel substitute, Regina Oliver, over the disciplinary case which he received. As a result of this case, Kiser received 15 days of solitary confinement, reduction in classification status, and the loss of 350 days of good time credits. TDCJ records show that Kiser is serving a sentence of life imprisonment; consequently, he is not eligible for release on mandatory supervision under Texas law. Arnold v. Cockrell, 306 F.3d 277 (5th Cir. 2002); Ex Parte Franks, 71 S.W.3d 327, 328 (Tex.Crim.App. 2001) (*en banc*) (inmates sentenced to life imprisonment are not eligible for mandatory supervision because the calculation of the date is mathematically impossible; the calendar time served, plus the accrued good time, can never add up to life).

This raises the question of whether or not Kiser has shown the violation of a constitutionally protected liberty interest as a result of the disciplinary case of which he complains. The Supreme Court has held that the States may, under certain circumstances, create liberty interests which are protected by the Due Process Clause, but these interests will be generally limited to freedom from

restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. Sandin v. Conner, 115 S.Ct. 2293, 2301 (1995).

In Sandin, a Hawaii prison inmate received a disciplinary case for "high misconduct" and two others for "low moderate misconduct." He appeared before the disciplinary hearing panel, but was not permitted to call witnesses. He was convicted of the charges and sentenced to 30 days of disciplinary segregation on the high misconduct charge and four hours of disciplinary segregation for each of the other two charges, served concurrently with the 30 days of confinement. Conner brought suit, claiming a denial of procedural due process in connection with the disciplinary hearing.

The trial court granted summary judgment in favor of the defendants, but was reversed on appeal. The Ninth Circuit held that Conner had a liberty interest in remaining free from disciplinary segregation and that there was a disputed question of fact with respect to whether or not Conner received all of the process due under the Supreme Court's decision in Wolff v. McDonnell, 418 U.S. 539 (1974).

In analyzing the plaintiff's claim, the Supreme Court first examined the state of the law, beginning with Wolff. There, the issue involved good time credits which bestowed mandatory sentence reductions and a regulation which provided that these credits could be revoked only for "flagrant or serious misconduct." Wolff, 418 U.S. at 545-46 and nn. 5 & 6. The Court held that the statutory provisions in question created a liberty interest in a shortened sentence, which was an interest of "real substance" requiring minimum procedures necessary to reach an "accommodation between institutional needs and objectives and the provisions of the Constitution." Wolff, 418 U.S. at 556-57.

Wolff was followed by Meachum v. Fano, 427 U.S. 215 (1976). There, Massachusetts inmates complained of transfers from a medium security facility to a maximum security prison which

had substantially less favorable conditions. These transfers did not involve the loss of good time credits or any period of disciplinary confinement. Meachum, 427 U.S. at 222.

In analyzing the claim, the Court first laid down the principle that the Due Process Clause does not protect every change in the conditions of confinement which has a substantial adverse effect upon a prisoner. Meachum, 427 U.S. at 224. Further, the Court held that the Due Process Clause itself does not create a liberty interest in prisoners being free from intrastate prison transfers because transfer to a maximum security facility, even one with more burdensome conditions, is "within the normal limits or range of custody which the conviction has authorized the State to impose." Meachum, 427 U.S. at 225. The Court said that Wolff was distinguishable because the protected liberty interest in good time credit was created by state law, while in Meachum, no law stripped away the discretion of state officials to transfer inmates for any reason or none at all. Meachum, 427 U.S. at 228.

### The Mandatory or Discretionary Language Analysis

The cases after Meachum seized upon this dictum to place ever greater emphasis upon the dichotomy between mandatory and discretionary state regulations. *See* Sandin, 115 S.Ct. at 2298. This approach came to fruition in Hewitt v. Helms, 459 U.S. 460 (1983). In Hewitt, the Court did not look to whether the State had created an interest of "real substance," as in Wolff; instead, the Court posed the question of whether the State had gone beyond issuing mere procedural guidelines and had used language of an unmistakably mandatory character such that an incursion upon liberty would not occur absent specified substantive predicates. Sandin, 115 S.Ct. at 2298, *quoting* Hewitt, 459 U.S. at 471-72.

The use of this methodology meant that inmates no longer were required to show an interest of "real substance" or that they faced a "grievous loss" of liberty retained after incarceration. Sandin, 115 S.Ct. at 2298, *citing* Morrissey v. Brewer, 408 U.S. 471, 481 (1972) (focusing on "grievous loss"). Instead, the inquiry had shifted from the nature of the deprivation to the language of the regulation. Sandin, 115 S.Ct. at 2299; *see* Olim v. Wakinekona, 461 U.S. 238 (1983) (liberty

6

interest in interstate transfer revolved around language of regulation); Kentucky Department of Corrections v. Thompson, 490 U.S. 454 (1989) (liberty interest in visitation privileges revolved around language of regulation).

These holdings were routinely followed by the circuit courts, including the Fifth Circuit. *See, e.g.*, Giovanni v. Lynn, 48 F.3d 908 (5th Cir. 1995) (analyzing the liberty interest presented in the context of the language of the regulations involved, citing Olim and Thompson).

### The Holding in Sandin

In Sandin, however, the Supreme Court announced that this analytical framework has "strayed from the real concerns undergirding the liberty protected by the Due Process Clause" and that "it is time to return" to the principles set out in Wolff and Meachum. Sandin, 115 S.Ct. at 2300. Rather than examining the language of the regulations, the Court stated that the operative interest involved was the nature of the deprivation. Hence, the Court specifically disapproved of the mandatory or discretionary language analysis set out in Hewitt and its progeny. Sandin, 115 S.Ct. at 2300 and n.5.

Instead, the Court held that the States may, under certain circumstances, create liberty interests which are protected by the Due Process Clause, but these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. Sandin, 115 S.Ct. at 2301.

Sandin cited Vitek v. Jones, 445 U.S. 480 (1980) (transfer to mental hospital triggers Due Process Clause) and Washington v. Harper, 494 U.S. 210, 221-222 (1990) (involuntary administration of psychotropic drugs implicates Due Process Clause), as examples of restraints which trigger the Clause of their own force, but stated that the incarceration in disciplinary segregation present in that case did not create the type of deprivation in which the State might have created a liberty interest. Sandin, 115 S.Ct. at 2297 n.4, 2299-300. As a result, the Court held that

7

neither the Hawaii prison regulation at issue nor the Due Process Clause itself afforded the inmate a protected liberty interest entitling him to the procedural protections of Wolff. Sandin, 115 S.Ct. at 2302. The Court concluded that the fact that Conner was not permitted to call witnesses at his disciplinary hearing was not sufficient to accord him relief because no protected liberty interest was at stake.

In this case, the punishments imposed upon Kiser include 15 days of solitary confinement, reduction in classification status, and the loss of 350 days of good time credits. The punishments of solitary confinement and loss of classification status do not impose atypical and significant hardships on an inmate in relation to the ordinary incidents of prison life. Pichardo v. Kinker, 73 F.3d 612, 613 (5th Cir. 1996); Malchi v. Thaler, 211 F.3d 953, 959 (5th Cir. 2000). Even though Kiser argues that he did not receive credit for the time he spent in pre-hearing detention, making his total confinement 40 days rather than 15, this still does not implicate a constitutionally protected liberty interest, and so Kiser's claims concerning these punishments are without merit.

Kiser also lost 350 days of good time credits. Under certain conditions, the loss of good time could inflict a punishment imposing an atypical and significant hardship upon an inmate, because the loss of such time could result in the denial of a liberty interest in early release from prison. This condition exists where an inmate is eligible for release on mandatory supervision. *See* Madison v. Parker, 104 F.3d 765 (5th Cir. 1997) (release on mandatory supervision is arguably a liberty interest in the State of Texas). However, in this case the prison records show that Kiser is serving a sentence of life imprisonment, and so he is ineligible for release on mandatory supervision under Texas law.

Thus, the loss of good time serves only to affect Kiser's possible release on parole, inasmuch as Texas law provides that the sole purpose of good time credits is to accelerate eligibility for release on parole or mandatory supervision. Tex. Gov. Code, §498.003(a). The Fifth Circuit has expressly held that there is no constitutional right to release on parole in the State of Texas. Creel v. Keene, 928 F.2d 707, 708-09 (5th Cir. 1991); Allison v. Kyle, 66 F.3d 71, 74 (5th Cir. 1995). Under these circumstances, the loss of good time credits do not affect a constitutionally protected right, but only

8

the "mere hope" of release on parole. This hope is not protected by due process. *See* Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 11 (1979); *accord*, Gilbertson v. Texas Board of Pardons and Paroles, 993 F.2d 74, 75 (5th Cir. 1993).

Furthermore, the timing of Kiser's release is too speculative to give rise to a constitutionally protected liberty interest. Malchi, 211 F.3d at 959. Kiser has failed to show the deprivation of a constitutionally protected liberty interest through the disciplinary case about which he complains, and so his claims concerning this disciplinary case must fail.

This includes the claim that Captain Jock "falsified the records" of the disciplinary proceeding. This claim also fails for another reason as well. At one time, the Fourth Circuit held that a claim of constitutional magnitude may be stated if an inmate shows that false information is in his file which is relied upon to a constitutionally significant degree. Paine v. Baker, 595 F.2d 197, 201 (4th Cir.), *cert. denied* 444 U.S. 925 (1979); *see also* Guthrie v. Evans, 93 F.R.D. 390, 395 (S.D. Ga. 1981) *and* McCrery v. Mark, 823 F.Supp. 288, 291 (E.D.Pa. 1993). The Fourth Circuit made clear that the fact that merely because an inmate disputes evaluations and opinions concerning him does not show that the information is false. Paine, 595 F.2d at 201.

However, Paine has been questioned by the Fifth Circuit and other courts, including the Fourth Circuit itself. Paine arose in the context of information in a parole file, and because inmates have no constitutional right to release on parole, the courts, including the Fifth Circuit, have concluded that there are no procedural due process protections for procedures unrelated to protected liberty interests. Johnson v. Rodriguez, 110 F.3d 299, 308-09 and n. 13 (5th Cir. 1997). In Johnson, the Fifth Circuit expressly stated that because Texas prisoners have no protected liberty interest in parole, they cannot mount a challenge against any state parole review procedure on procedural or substantive grounds. Johnson, 110 F.3d at 308. Consequently, Johnson's allegation that the Board considered unreliable or even false information in making parole determinations, without more, did not assert a federal constitutional violation.

9

Similarly, Kiser has failed to show that the allegedly false information implicated a constitutionally protected liberty interest, because the alleged falsification occurred in the context of a disciplinary case which did not implicate any such liberty interest. Kiser's claim against Captain Jock on this point is without merit.

Kiser has also failed to set out a constitutional claim against Mikkal Robbins, the camera operator. Even if he is correct that she did not start the camera until after the incident was over, Kiser has failed to show that this implicates a constitutionally protected liberty interest. *See, e.g.*, Trevino v. Johnson, civil action no. 9:05cv171 (E.D.Tex., dismissed as frivolous December 8, 2005) (no appeal taken) (dismissing claims against camera operator in use of force for failing to set out a constitutional violation). It is accordingly

ORDERED that the Plaintiff's claims against William Jock, Regina Oliver, and Mikkal Robbins are hereby DISMISSED as frivolous and for failure to state a claim upon which relief may be granted. 28 U.S.C. §1915A.

ORDERED that William Jock, Regina Oliver, and Mikkal Robbins are hereby DISMISSED as parties to this lawsuit. The dismissal of these claims and parties shall have no effect upon the remainder of the Plaintiff's claims in this case. Finally, it is

ORDERED that the dismissal of these claims and parties shall not count as a strike for purposes of 28 U.S.C. §1915(g).

So **ORDERED** and **SIGNED** this **21** day of **May, 2009.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE